NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (4th) 240892-U

NO. 4-24-0892

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 1, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* K.W., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | No. 18JA208 |
| v. | ) | |
| Gary W., | ) | Honorable |
| Respondent-Appellant). | ) | Dwayne A. Gab, |
| | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Justices DeArmond and Vancil concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, concluding the trial court's judgments finding respondent unfit and finding it in the minor's best interest for his parental rights to be terminated were not against the manifest weight of the evidence.

¶ 2    In January 2021, the State filed a petition to terminate the parental rights of respondent, Gary W., to his minor child, K.W. (born December 2013). The trial court found respondent unfit and determined it was in K.W.'s best interest to terminate his parental rights. Respondent appeals, arguing the court's unfitness and best-interest findings were against the manifest weight of the evidence. We affirm.

¶ 3                              I. BACKGROUND

¶ 4              A. The Wardship Petition and Shelter Care Order

¶ 5    In September 2018, the State filed a petition seeking to adjudicate K.W. abused and neglected under the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.*

(West 2018)). The State alleged K.W. was physically abused in that respondent forced her to ingest cannabis (*id.* § 2-3(2)(i)). The State also alleged K.W. was neglected for being in an environment injurious to her welfare due to her sibling also ingesting cannabis in respondent's home and respondent using drugs (*id.* § 2-3(1)(b)). Following a shelter care hearing, the trial court entered an order granting temporary guardianship and custody of K.W. to the Illinois Department of Children and Family Services (DCFS).

¶ 6                                     B. The Adjudicatory and Dispositional Orders

¶ 7          In November 2018, respondent stipulated to the neglect petition and the trial court adjudicated K.W. neglected. In December 2018, the court entered a dispositional order finding respondent unfit, unable, or unwilling, for reasons other than financial circumstances alone, to care for K.W., making her a ward of the court, and placing her guardianship and custody with DCFS.

¶ 8                                     C. The Termination Petition

¶ 9          In January 2021, the State filed a petition to terminate respondent's parental rights. The State alleged respondent was unfit for (1) failing to maintain a reasonable degree of interest, concern, or responsibility as to K.W.'s welfare (750 ILCS 50/1(D)(b) (West 2020)); (2) failing to make reasonable efforts to correct the conditions that were the bases for her removal during two nine-month periods following the adjudication of neglect, namely (a) November 14, 2018, to August 14, 2019, and (b) August 14, 2019, to May 14, 2020 (*id.* § 1(D)(m)(i)); and (3) failing to make reasonable progress towards her return during the same periods (*id.* § 1(D)(m)(ii)).

¶ 10                                    D. The Fitness Hearing

¶ 11         The fitness hearing commenced on May 13, 2021, but did not conclude until July 28, 2022.

¶ 12                                    1. *Danielle Croll*

¶ 13                              a. Respondent's Required Services

¶ 14         Danielle Croll had been employed with Lutheran Child and Family Services since December 2017 and had been K.W.'s caseworker since September 2018. Croll determined which services would be appropriate for respondent based on the outcome of the integrated assessment. Croll discussed the integrated assessment and resulting service requirements with respondent in November 2018 with the assistance of a sign language interpreter respondent needed due to his hearing impairment. Seven services and/or other requirements were recommended for respondent, namely (1) a substance abuse assessment, (2) drug drops, (3) individual counseling, (4) parenting classes, (5) domestic violence classes, (6) development of a support system, and (7) maintaining a relationship with K.W. The substance abuse assessment was recommended due to respondent's use of cannabis and his failure to take responsibility for K.W. and her sibling testing positive for cannabis. Parenting classes were recommended due to K.W. and her siblings reporting being the victims of multiple incidents of corporal punishment. Domestic violence classes were recommended because of K.W. and her siblings witnessing multiple incidents of domestic violence in which their mother was the victim. (K.W.'s mother has separately appealed the termination of her parental rights to K.W. and two other minors and is not a party to the instant appeal.) In pursuance of the goal of developing a support system, Croll arranged for respondent to work with an advocate from Primed for Life.

¶ 15                              b. Administrative Case Reviews

¶ 16                    *i. March 2019 Administrative Case Review*

¶ 17         Croll held an administrative case review in March 2019 to discuss respondent's progress in his services. By that time, respondent was attending drug drops but had not completed

the substance abuse assessment. Respondent had been set up for individual counseling but was not yet engaged in it. Respondent had engaged at least once in parent coaching (and not traditional parenting classes) by that time, but visits with K.W. (and her siblings) had been suspended due to a pending investigation into respondent's alleged sexual abuse of one of her siblings. Accordingly, respondent was required to obtain a sexual abuse perpetrator assessment, which, as Croll explained, he could obtain from either Memorial Behavioral Health or the health department on a walk-in basis. Croll did not have any proof respondent attended domestic violence classes.

¶ 18                    *ii. September 2019 Administrative Case Review*

¶ 19         Croll held another administrative case review in September 2019. By that time, Croll had not received any proof respondent completed the substance abuse assessment or engaged in parenting classes. Respondent had begun individual counseling, but the supervisor at the counseling facility recommended he complete the sexual abuse perpetrator assessment before continuing individual counseling. Respondent was recommended for a walk-in assessment, but Croll did not have any proof he completed it by the time of this review.

¶ 20                    *iii. March 2020 Administrative Case Review*

¶ 21         Croll held a third administrative case review in March 2020. Croll still did not have any proof respondent completed the substance abuse assessment, engaged in domestic violence classes, or resumed individual counseling or parent coaching.

¶ 22                    *iv. March 2021 Administrative Case Review*

¶ 23         Croll held a fourth administrative case review in March 2021. Respondent began substance abuse services in September 2020—two years after the opening of the case. Respondent still had not completed the sexual abuse assessment, which was required before he could resume individual counseling. Respondent reengaged in parent coaching in November 2020, though

visitation remained suspended. Croll did not have any proof respondent engaged in domestic violence classes.

¶ 24 Croll testified she did not "at any time in this case" feel comfortable with returning K.W. to respondent due to his not completing services and due to the sexual abuse of one of K.W.'s siblings, for which respondent had been indicated.

¶ 25 c. Cross-Examination

¶ 26 On cross-examination, Croll stated she considered the fact that respondent was hearing impaired before requiring him to undergo a walk-in sexual abuse assessment. Croll asked respondent to "call up there and let [her] know when there was a date," which he could accomplish through a "video phone" he used, which is "similar to FaceTime." Croll explained that respondent was accepted as a client by the Parent Place for parenting classes, but they thought parent coaching "would work better as it was a one-on-one situation versus a class." Respondent moved to Reynolds, Illinois, at one point to live with family members who could provide "a better support system." However, Croll was not able to contact respondent during that time because his phone was disconnected. Upon his return to Springfield, Illinois, respondent declined Croll's invitation to continue working with his Primed for Life advocate.

¶ 27 The trial court admitted a collection of reports from DCFS. These documents reflect that respondent tested positive for cannabis six times between October 23, 2018, and January 17, 2019, positive for cocaine on May 20, 2019, and positive for cannabis five additional times between November 18, 2019, and May 22, 2020.

¶ 28 2. *Respondent*

¶ 29 Respondent testified that he was provided a sign language interpreter to assist with the completion of the integrated assessment, but he "didn't exactly interpret" what respondent was

- 5 -

signing. Respondent believed DCFS added services to his service plan after 2019, which he "didn't want" and which he felt were "not for [him]." Respondent told DCFS that he smoked cannabis due to being in a car accident, but "they didn't believe it." Respondent also testified to being addicted to methamphetamine and undergoing withdrawal at one point. Respondent testified regarding the difficulties he experienced with communicating with his service providers. Respondent had to use an iPad to call a call center, which would then call the service provider and interpret back and forth between the provider and respondent. However, the iPad would work only sporadically. Respondent said he completed substance abuse services at Family Guidance Center in May 2021 (after not completing the assessment until September 2020) and has since maintained a substance-free lifestyle, except for cannabis, for which he received a medical card in June 2020. Respondent completed parent coaching through The Parent Place in April 2021. Respondent completed domestic violence services in mid-2021 and testified that he had "changed" and had improved his anger issues. Respondent had not seen K.W. since January 8, 2019, and claimed to have "no idea" why he could not see her.

¶ 30                              E. The Trial Court's Fitness Determination

¶ 31            On October 20, 2022, the trial court entered an order finding respondent unfit for (1) failing to maintain a reasonable degree of interest, concern, or responsibility as to K.W.'s welfare; (2) failing to make reasonable efforts to correct the conditions which were the bases for her removal during both nine-month periods alleged in the termination petition; and (3) failing to make reasonable progress towards her return during these same periods. We note the court's written order of October 18, 2022, contained certain typographical errors, but any confusion caused by that order was corrected in the order entered two days later entitled "Order of Adjudication on Motion for Termination of Parental Rights."

¶ 32 After noting the services recommended for respondent "were specifically tailored to address why [K.W.] came into care as well as to address other safety concerns uncovered during the case," the trial court noted how the evidence established respondent "did not complete critical services including drug assessment and treatment, domestic violence treatment, individual counseling[,] and sex offender assessment and treatment during the specific time periods alleged by the State." The court also observed that respondent's testimony established he has struggled with substance abuse throughout his life and this challenge "remain[s] unresolved based upon his own testimony."

¶ 33 F. The Best-Interest Hearing

¶ 34 The best-interest hearing commenced on January 12, 2023, but did not conclude until March 18, 2024.

¶ 35 1. *Danielle Croll*

¶ 36 Croll was K.W.'s caseworker at Lutheran Child and Family Services until April 2022, whereupon she began working at Family Services Center.

¶ 37 K.W. had been in two foster placements since this case began but had been in her current placement since November 2018. K.W.'s foster parents expressed a willingness to adopt her if the permanency goal changed. While Croll was the caseworker, K.W.'s foster parents provided all her educational, social, and medical needs. Croll believed K.W. felt safety and security in her placement.

¶ 38 While Croll was the caseworker, K.W.'s foster parents were willing to maintain communication with respondent "as long as it was safe and appropriate." The agency allowed respondent and K.W. to exchange written communication. Notwithstanding this written communication with respondent, Croll believed it to be in K.W.'s best interest to have permanency

in her current foster home. K.W. would still be able to "maintain a relationship with [respondent] through the foster parents in a safe manner." Croll agreed that K.W. wanted to have a relationship with respondent, and Croll would support this in terms of continued written communication between them.

¶ 39                                          2. *Patricia Dorsey*

¶ 40          Patricia Dorsey had been K.W.'s caseworker since beginning at Lutheran Child and Family Services in August 2022. As of December 2023, respondent was still not permitted in-person visits with K.W. due to "currently open allegations" against him. According to Dorsey, K.W.'s foster father was willing to maintain written communication between respondent and K.W., "as long as [it was] appropriate." Dorsey was concerned about the content of respondent's e-mails to K.W., explaining, "Sometimes the communication can be a little bold for a small child. A lot of feelings come out, and sometimes he says a bunch of things that a young child shouldn't hear." This required K.W.'s foster parents to "filter a lot of the communication between [respondent] and [K.W.]" Notably, K.W. declined offers to set up visits with respondent and "just wanted to make sure that he was still alive."

¶ 41          K.W. consistently described her future as being with her foster parents, who wanted to adopt her. K.W.'s foster parents were meeting all her medical and educational needs and had her enrolled in basketball and volleyball programs. K.W. wanted to be involved in the volleyball program because her older foster sister was. The agency believed K.W. was "doing great" in her foster home and should be adopted. K.W. stated "multiple times that she's ready to be adopted by this family." K.W. called her foster parents "Papa Bear and Mama Bear," as well as "Papa Joe and Mama Amy." K.W. already had an outfit picked out for the day of her adoption and "knows where

she's going to have her adoption meal," having "planned down to the T as to what's going to take place." When asked to describe the bond K.W. had with her foster siblings, Dorsey explained:

> "She's very close with the littles. She does a lot for them. She's like a little mom around them. She likes to keep—you know, read to them, play with them. She has these guinea pigs on her land that she takes care of and she's been teaching the little girl how to, like, hold them and be gentle with them and things like that.
>
> So she takes pride in being a big sister to the little kids. But she looks up really well to the older kids, as well. She kind of does a lot they do."

¶ 42    Dorsey testified about an incident in December 2023 when K.W. "basically had a meltdown crying and telling the foster parents she had been holding a secret that mom had told her to keep about where [respondent] was located and that she didn't feel comfortable keeping the secret any longer." K.W.'s mother apparently told K.W. where respondent was living and that "at the next visit she would have an address as to where he was staying and not to tell anybody because she didn't want them to get in trouble." K.W. reported feeling sick, not being able to sleep, and feeling worried about how her mother would react to her having divulged this secret. When asked to explain why K.W. felt so distressed about this, Dorsey explained:

> "She just said that she hadn't saw [*sic*] [respondent] in a long time and that she doesn't have good memories of him being nice to people. And she didn't want him to hurt—not her, but she felt that he would hurt her foster parents or cause trouble to get to her."

¶ 43 Due to K.W.'s distress, she and Dorsey discussed how K.W. should respond if she saw respondent out in public. K.W. and her foster parents would have a "code word" for this situation, which would prompt them to leave the area without any questions asked. Dorsey described K.W. being "anxious and worried and afraid to pretty much play in her own backyard because of this." Dorsey also stated that K.W. told her about respondent allegedly killing her uncle and an incident where respondent battered her mother. K.W. disclosed these incidents when Dorsey went to pick her up for the January 2024 visit and K.W. said she did not want to go.

¶ 44 When testifying on March 7, 2024, Dorsey noted respondent had not contacted K.W. since January 3, 2024, and she was unaware of any barriers to respondent making contact. Respondent contacted Dorsey on December 5, 2023, regarding giving birthday presents to K.W. Dorsey offered to have respondent bring her the presents so she could deliver them because K.W. did not want to visit with him. K.W.'s foster parents offered this same option, but respondent "didn't reach back out to them after that."

¶ 45 Despite K.W. having some bond with respondent, Dorsey felt she should be adopted by her foster parents. When asked why, Dorsey explained:

> "Mainly because [K.W.] hasn't had any contact with [respondent]. And when you talk to her about actually having any visits, she declines. She doesn't feel safe. She doesn't know what to expect. She—she came out and told us, like, she's afraid of him. She saw him do things in her past and remembered things from happening when the family was together that scares [*sic*] her."

¶ 46                                    3. *Respondent*

¶ 47          Respondent testified he signed K.W.'s birth certificate and picked her name. Respondent took care of K.W. after she was born so her mother could rest, changed her diapers, bathed her, and took her to doctor's appointments. Respondent also taught K.W. sign language and helped her with homework. Respondent testified to having a "very, very strong bond" with K.W. and stated she also is bonded with his cousin and aunts. Respondent was of the belief that K.W. "really wants to be with [him]" and "wants to see [him] so bad." Respondent said he accepted responsibility for his acts of domestic violence while K.W. lived with him. Respondent said he is "heartbroken" and "hurt" over the current situation and will be "heartbroken" if his parental rights are terminated. Respondent stated K.W. would also "feel hurt." Respondent believed guardianship would be preferable to K.W. being adopted.

¶ 48                     G. The Trial Court's Best-Interest Determination

¶ 49          On June 20, 2024, the trial court entered an order finding termination of respondent's parental rights to be in K.W.'s best interest. The court noted K.W. "has been in the same foster home for [five] years and that she is well cared for in the home and has developed strong attachments with the family in the home." The court found K.W.'s foster home met her needs for "safety, security, and permanency."

¶ 50          This appeal followed.

¶ 51                                    II. ANALYSIS

¶ 52          On appeal, respondent argues the trial court's unfitness and best-interest findings were against the manifest weight of the evidence.

¶ 53                            A. The Unfitness Finding

¶ 54        The Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption

Act (750 ILCS 50/1 *et seq.* (West 2020)) govern how the State may terminate parental rights. *In re*

*D.F.*, 201 Ill. 2d 476, 494 (2002). Together, these statutes outline two necessary steps the State

must take before terminating a person's parental rights—the State must first show the parent is an

"unfit person," and then the State must show terminating parental rights serves the best interest of

the child. *Id.* at 494-95.

¶ 55        "The State must prove parental unfitness by clear and convincing evidence."

(Internal quotation marks omitted.) *In re A.L.*, 409 Ill. App. 3d 492, 500 (2011). The Adoption Act

provides several grounds on which a trial court may find a parent "unfit." 750 ILCS 50/1(D) (West

2022). Despite several potential bases for unfitness, "sufficient evidence of one statutory ground

*** [is] enough to support a [trial court's] finding that someone [is] an unfit person." (Internal

quotation marks omitted.) *In re F.P.*, 2014 IL App (4th) 140360, ¶ 83.

¶ 56        The trial court found respondent unfit under three statutory grounds, including the

failure to maintain a reasonable degree of interest, concern, or responsibility as to K.W.'s welfare.

The language used by our legislature in section 1(D)(b) of the Adoption Act is in the disjunctive,

meaning that any one of the three elements—interest or concern or responsibility—"may be

considered by itself as a basis for unfitness." *In re B'Yata I.*, 2014 IL App (2d) 130558-B, ¶ 31

(citing 750 ILCS 50/1(D)(b) (West 2012)). The court must "examine[ ] the parent's conduct

concerning the child in the context of the circumstances in which that conduct occurred." *Id.* (citing

*In re Adoption of Syck*, 138 Ill. 2d 255, 278 (1990)). "We are mindful, however, that a parent is

not fit merely because he or she has demonstrated some interest or affection toward the child." *Id.*

(citing *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004)). Instead, the court must objectively assess

whether the interest, concern, or responsibility is reasonable. *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006)). Importantly, "[n]oncompliance with an imposed service plan, a continued addiction to drugs, [and] a repeated failure to obtain treatment for an addiction *** have all been held to be sufficient evidence warranting a finding of unfitness under subsection (b)." *Jaron Z.*, 348 Ill. App. 3d at 259.

¶ 57       This court affords great deference to a trial court's fitness finding "because of [that court's] superior opportunity to observe the witnesses and evaluate their credibility." (Internal quotation marks omitted.) *A.L.*, 409 Ill. App. 3d at 500. We will not disturb a finding of unfitness unless it is against the manifest weight of the evidence. *In re J.H.*, 2020 IL App (4th) 200150, ¶ 68. "A finding is against the manifest weight of the evidence only if the evidence clearly calls for the opposite finding [citation], such that no reasonable person could arrive at the [trial] court's finding on the basis of the evidence in the record [citation.]" (Internal quotation marks omitted.) *Id.*

¶ 58       Here, the evidence established respondent failed to maintain a reasonable degree of responsibility as to K.W.'s welfare. In November 2018, Croll explained to respondent that he was required to participate in (1) a substance abuse assessment, (2) drug drops, (3) individual counseling, (4) parenting classes, and (5) domestic violence classes, as well as to (6) develop a support system and (7) maintain a relationship with K.W. At the fitness hearing, Croll testified regarding respondent's progress between March 2019 and March 2021 in his services, as assessed through four administrative case reviews—5 to 29 months after the opening of the case. By the final administrative case review, respondent attended drug drops and began individual counseling and parent coaching, but he still had not completed substance abuse treatment, parent coaching, or domestic violence classes. Respondent was not in contact with Croll while living in Reynolds and declined Croll's invitation to continue working with his Primed for Life advocate after returning

to Springfield. In early 2019, respondent was required to undergo a sexual abuse perpetrator assessment (in order to resume individual counseling) due to being investigated for allegedly sexually abusing one of K.W.'s siblings, but he had not completed this by the final administrative case review. Consequently, visitation with K.W. remained suspended. Respondent did not complete substance abuse treatment, parent coaching, or domestic violence services until mid-2021—over two and a half years after the opening of this case. Moreover, respondent's substance abuse issues persisted during the first 19 months of this case. Respondent tested positive for cannabis six times between October 23, 2018, and January 17, 2019, cocaine on May 20, 2019, and cannabis five additional times between November 18, 2019, and May 22, 2020—all before obtaining a medical cannabis card. In addition, respondent testified to having been addicted to methamphetamine.

¶ 59        In sum, respondent, as the trial court observed, "did not complete critical services" during both nine-month periods alleged by the State and continued to use drugs during much of this time. We conclude the court's unfitness finding was not against the manifest weight of the evidence, as the evidence supports a finding that respondent failed to maintain a reasonable degree of responsibility as to K.W.'s welfare and does not clearly call for an opposite finding. See *Jaron Z.*, 348 Ill. App. 3d at 259; *J.H.*, 2020 IL App (4th) 200150, ¶ 68.

¶ 60                                B. The Best-Interest Finding

¶ 61        After a trial court finds a parent unfit, "the court then determines whether it is in the best interests of the minor that parental rights be terminated." *In re D.T.*, 212 Ill. 2d 347, 352 (2004). "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.* at 364. In making

the best-interest determination, the court must consider the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2022)). These factors include:

"(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009) (citing 705 ILCS 405/1-3(4.05) (West 2008)).

"The court's best interest determination [need not] contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the trial court below in affirming its decision." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. On review, "[w]e will not disturb a court's finding that termination is in the [child's] best interest unless it was against the manifest weight of the evidence." *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005). "A finding is against the manifest weight of the evidence only if the evidence clearly calls for the opposite finding [citation], such that no reasonable person could arrive at the [trial] court's finding on the basis of the evidence in the record [citation]." (Internal quotation marks omitted.) *J.H.*, 2020 IL App (4th) 200150, ¶ 68.

¶ 62          Here, the evidence established that it was in K.W.'s best interest to terminate respondent's parental rights. K.W. has been in her foster placement since November 2018, and her foster parents expressed a willingness to adopt her and to maintain lines of communication with respondent. The foster parents have been providing K.W. with all her educational, social, and medical needs, and she feels safe with them. K.W.'s foster parents enrolled her in basketball and volleyball programs, the latter specifically because of her desire to participate in a sports activity with her older foster sister. Dorsey testified about the very close bond K.W. has established with her foster siblings. K.W. has stated "multiple times that she's ready to be adopted by this family," calls her foster parents "Papa Bear and Mama Bear," as well as "Papa Joe and Mama Amy," and has "planned down to the T as to what's going to take place" to celebrate the day of her adoption.

¶ 63          Despite K.W. wanting to have a relationship with respondent, both Croll and Dorsey testified about how important it was for K.W. to do so only if it was safe and appropriate. In particular, Dorsey testified about how K.W. did not feel safe with respondent and has reported being afraid of him due to past incidents that scare her when she remembers them, including an incident in which he allegedly killed her uncle and another in which he battered her mother. Dorsey's testimony illustrated the significant distress respondent has caused K.W., including (1) being sick and not able to sleep when she revealed having learned his address from her mother, (2) fearing he would hurt her foster parents, (3) having to come up with a "code word" in order to quickly escape should she and her foster parents see him out in public, and (4) being persistently "anxious and worried and afraid to pretty much play in her own backyard because of this." Moreover, K.W. has repeatedly declined invitations to have in-person visits with respondent, reporting that she merely wants "to make sure that he was still alive."

¶ 64        Respondent testified regarding his bond with, and profound love for, K.W., and how he (and potentially she) would feel if his parental rights were terminated. However, "[f]ollowing a finding of unfitness *** the focus shifts to the child. The issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *D.T.*, 212 Ill. 2d at 364. The law is clear that the existence of a parent-child bond "does not automatically insure that *** the child's best interests will be served by that parent." *In re J.B.*, 198 Ill. App. 3d 495, 499 (1990). The trial court's finding termination of respondent's parental rights was in K.W.'s best interest was well-supported by the record. We conclude the trial court's best-interest finding was not against the manifest weight of the evidence, as we cannot say that the evidence adduced clearly calls for the opposite conclusion.

¶ 65                                       III. CONCLUSION

¶ 66        For the reasons stated, we affirm the trial court's judgment.

¶ 67        Affirmed.